## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| 229 IRON STREET LCC,<br><br>*Plaintiff,*<br><br>v.<br><br>AMGUARD INSURANCE CO.,<br><br>*Defendant.* | Civil Action No.<br>3:25-cv-01130(SFR)<br><br><br><br>October 16, 2025 |

### PLAINTIFF'S FIRST AMENDED COMPLAINT

Pursuant to the Court's Order of September 26, 2025 [Doc. 16], Plaintiff 229 Iron Street LLC ("Plaintiff") hereby files this Amended Complaint against Defendant AmGUARD Insurance Company ("Defendant" or "AmGUARD"), in response to Defendant's Motions for more Definitive Statements, to Dismiss, and/or to Strike [Doc. 15], which addresses Defendant's arguments raised therein.

### NATURE OF THE ACTION

1.     Plaintiff brings this Complaint to recover insurance policy benefits and damages from Defendant, its property insurance carrier, based on Defendant's wholly unjustifiable and bad-faith refusal to cover certain water-related damage that arose at Plaintiffs' insured premises more commonly known 229 Iron Street, Ledyard, Connecticut 06339-1572 (the "Premises") following a second-floor bathroom water overflow incident on or about July 15, 2023.

2.      The damage occurred after the Premise's second-floor bathroom bathtub overflowed, resulting in substantial water damage to that situs as well as other adjacent house areas, causing extensive damage to the flooring, interior fixtures and other items.

3.      Fortunately, Plaintiff had purchased property and liability insurance— at significant expense—to protect against precisely these types of unforeseeable and unpreventable losses, and they promptly reported claims (for both the property and liability coverages) to Defendant.

4.      Plaintiff submitted a timely notice of claim to Defendant, who accepted coverage of the claim.

5.      In connection with the 2023 loss, Plaintiff engaged a public adjuster to assist in the claims handling process.

6.      On or about January 28, 2025, Plaintiff's public adjuster submitted a loss estimation of $102,833.27. To date, Defendant has only paid out $53,818.46 of the claimed loss.

7.      In the interim, a new loss was identified at the Premises on February 6, 2025, timely notice of which was provided to Defendant, which accepted coverage pursuant to a reservation of rights letter pending resolution of its investigation of the loss.

8.      The situs of the new loss corresponded with that of the 2023 overflow incident, which, based on the reservation of rights, entitled Defendant to continue its claim investigation and effectively precluded repairs of the 2023 loss to avoid

tampering with Defendant's 2025 loss investigation. During this delay, however, building materials to repair some of the 2023 loss damage were likewise damaged by the 2025 loss.

9.    On or about May 30, 2025, the successor adjuster submitted a total claim amount of $113,148.94 with respect to the 2023 dwelling loss, requesting additional funds from Defendant to cover items needed to complete repairs on the Premises that were not included in the initial insurance estimate of January 2025.

10.    As Defendant continued its investigation of the 2023 and 2025 loss, Plaintiff's initial and successor public adjusters proposed agreements to toll the limitations period on the 2023 claim so as not to disrupt Defendant's claim processing—an industry standard procedure.

11.    Defendant informed Plaintiff that it would not grant the tolling request on June 13, 2025.

12.    Following that, on or about June 27, 2025, Defendant approved a loss estimate of $53,818.46.

13.    Thereafter, on or about July 9, 2025, Defendant engaged a flooring expert to assess the repairability of the Premises 200-plus-year-old hardwood floors.

14.    Plaintiff and Defendant continue to work on resolution of the insurance claims, but, because Defendant rejected the tolling agreement, Plaintiff has been forced to file suit.

15.    Through its handling of Plaintiffs' claims, Defendant has engaged in unfair, result-oriented claim settlement practices aimed at avoiding coverage by any means necessary. Defendant thereby has breached the terms of Plaintiffs' policy, acted in bad faith, and violated the Connecticut Unfair Insurance Practices Act and Unfair Trade Practices Act. Plaintiff brings this action to hold Defendant accountable for its wrongful conduct.

## PARTIES

16.    The Plaintiff, 229 Iron St LLC, is a limited liability company organized under Connecticut law. Its principal place of business is in Bronx, New York.

17.    Defendant AmGUARD is an insurance company organized under Pennsylvania law. Its principal place of business is in Wilkes-Barre- PA. It is a licensed and approved insurance company in the State of Connecticut.

## JURISDICTION AND VENUE

18.    Jurisdiction is proper in this Court under 28 U.S.C. § 1332(a) because Plaintiff and Defendant are citizens of different states and the amount in controversy exceeds $75,000 (exclusive of interest and costs).

19.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial portion of the events giving rise to Plaintiff's causes of action occurred in this district.

## BACKGROUND

20.    Plaintiff is a Connecticut Limited Liability engaged in the business of owning and leasing real estate holdings.

21.    Plaintiff's corporate headquarters is in Bronx, New York.

22.    On or about August 17, 2021, Plaintiff became the record owner of the Premises.

### 2023 Water Overflow Incident

23.    On or about July 15, 2023, Plaintiff discovered significant water damage apparently caused by a second-floor bathroom water overflow incident. The damage affected various areas and items of the Premises' first and second floors.

24.    Pursuant to Plaintiff's first public adjuster, as of January 28, 2025, the estimated costs to repair the water damage was $102,833.27.

25.    Shortly thereafter, on or about February 6, 2025, the Premises suffered additional damage, notice of which was timely given by Plaintiff and coverage acknowledged, under a reservation of rights, by Defendant.

26.    Because the two (2) loss claims affected the same Premises, Defendant investigated each loss to determine, among other things, source of loss.

27.    Thus, on or about May 30, 2025, Plaintiff's successor public adjuster submitted a total claim amount of $113,148.94 with respect to the 2023 dwelling loss.

28.   As of June 27, 2025, Defendant has approved a damage estimate of $53,818.46.

## A. <u>Second-Floor Damage</u>

29.   The water overflow originated in the second-floor bathroom, impacting approximately 1,200 square feet across multiple rooms and the hallway. In the linen closet, damages required full wall and ceiling repainting, replacement of base, shoe, and trim boards, and sanding, staining, and finishing of the wood floor, including specialty dustless sanding.

30.   The adjacent blue bedroom, a larger space under a peaked ceiling, sustained more extensive damage due to significant water saturation. Restoration efforts in this room included plaster removal and replacement in bubbled sections, full wall and ceiling repainting, complete flooring refinishing, and baseboard replacement. Specialized work was also required for detaching and resetting a radiator, restoring a hand-painted mural, and repairing custom cabinetry faces.

31.   The small closet, affected similarly, required repainting of walls and ceiling, trim replacement, and floor refinishing using a dustless sanding process.

32.   The second-floor hallway sustained saturation damage to both walls and flooring. Remediation included repainting, partial oak plank floor replacement with vapor barrier installation, full refinishing of the remaining flooring, baseboard replacement, and temporary removal of door hardware to facilitate

uniform painting. The need for repairs also extended to cabinetry faces within this area.

33.    The second-floor bathroom, as the origin point, sustained the most extensive impact. Restoration involved removal and replacement of blown-in insulation and two-coat plaster over gypsum, application of a latex-based stain blocker beyond the immediate floor perimeter, full wall repainting, and work on base shoe and chair rail elements. Fixtures such as the claw-foot tub, toilet, wall-mounted sink, and associated supply lines required careful detachment and resetting. The radiator also required priming and painting. Flooring repairs included full oak plank replacement.

34.    Additional second-floor rooms, including a large closet and a second bedroom, required similar treatments: wall and ceiling repainting, removal and replacement of trim elements, and plaster ceiling work with vapor barrier installations. These areas contributed significantly to the aggregate of second-floor damage.

**B. First-Floor Damage**

35.    Water infiltrated the first floor via the walls, ceilings, and subflooring, affecting approximately 1,500 square feet and causing compounding damage due to delays in repairs. This included mold growth in subflooring and spoilage of ordered materials held in abeyance pending claim resolution.

36.   The bedroom located directly below the second-floor bathroom suffered from plaster degradation and floor damage, requiring removal and replacement of ceiling and wall materials, trim work, and full oak plank flooring installation with a vapor barrier.

37.   In the entryway and foyer, repair work involved insulation removal and replacement, substantial plaster repairs, wood window repainting, and baseboard replacement.

38.   The dining room required contents manipulation, detachment of window drapery, and replacement of damaged flooring and ceiling plaster.

39.   The living room experienced localized plaster failure and required door slab repainting along with ceiling restoration.

40.   Stairwell repairs included plaster remediation and final cleaning.

41.   First-floor damages—encompassing repairs, contents handling, masking preparation, and debris removal—represented a substantial portion of the total claim.

## C. <u>General and Supplemental Damage</u>

42.   Dwelling-wide expenses include residential supervision and project management extending over several weeks, asbestos testing, content manipulation and pack-out services, and code compliance upgrades under ordinance or law coverage. Overhead, profit, and applicable taxes (materials, cleaning supplies, debris removal) further increased total project costs.

43.    Secondary damages resulting from delays—such as mold remediation over several hundred square feet and the loss of fair rental value or use of the premises—remain incompletely quantified but are covered under the applicable policy. These issues arose due to Defendant's failure to dispatch a cause-of-loss vendor, rejection of tolling agreements in February and again on June 13, 2025, and the withholding of critical inspection reports.

### D. <u>Totals and Resulting Harms</u>

44.    The total replacement cost value for all documented damage is substantial, with a significantly lower actual cash value after depreciation and application of the policy deductible. Defendant's partial approval omits critical items, including the full replacement of antique hardwood flooring (where patching is not feasible), restoration of fixtures and moldings associated with plaster removal, and cost escalations arising from overlaps with the 2025 claim.

45.    The difference between what Plaintiff is owed and what has been paid constitutes a substantial shortfall. This gap, combined with attorneys' fees, interest, and ongoing loss of use, forms the core of Plaintiff's compensatory damages.

46.    Defendant's delayed investigation, refusal to enter tolling agreements, and failure to fully adjust the claim has deprived Plaintiff of significant policy benefits. The necessary repair costs to restore the Premises far exceed what Defendant has acknowledged or paid.

47.  Plaintiff has also suffered secondary losses due to the delays—such as mold growth and continued loss of habitability. Defendant's repeated refusal to act in good faith, including failure to dispatch a cause-of-loss expert and withholding the H2M flooring report (which was in its possession for over two months), has directly exacerbated these harms.

48.  Plaintiff has incurred attorney fees and litigation costs solely due to Defendant's failure to fulfill its coverage obligations under the policy. These costs would not have been necessary but for Defendant's breach of its duties.

49.  Plaintiff has acted in good faith throughout the claims process, engaging in consistent communication and cooperation. Defendant's failure to respond with a timely and complete investigation has forced Plaintiff to pursue judicial relief to obtain the coverage owed.

50.  Because Defendant accepted coverage of the 2025 case under a reservation of rights, its investigation is supposedly ongoing, and Defendant has not covered the full amount of the covered damages incurred by Plaintiff.

## Plaintiff's Property Insurance Policy

51.  Plaintiff sought insurance coverage for the water damage under a commercial property insurance policy that it had purchased from Defendant, with policy number TWHO433872 (the "Policy")

52.    Defendant is a subsidiary of Berkshire Hathaway GUARD Insurance Companies, which are owned by Berkshire Hathaway Inc. – an A+ Superior rated company by A.M. Best.

53.    The Policy has a coverage period of May 27, 2023 to May 27, 2024, and it specifically identifies the Premises as an insured location.

54.    Pursuant to the Policy's Property Coverage Form, the Policy provides up to $663,244 in "Dwelling" coverage for the Premises and up to $198,973 in "Loss of Use" coverage. The "Dwelling" coverage applies (in relevant part) to "[t]he dwelling on the 'residence premises,' including structures attached" thereto.

55.    The "Loss of Use" coverage comprises the total limits for the coverage of "Additional Living Expenses," "Fair Rental Value," and "Civil Authority Prohibits Use."

56.    Defendant accepted coverage for the 2023 dwelling loss.

57.    Plaintiff has made every effort to cooperate with Defendant in good faith, including consistent communication and sharing of pertinent claim information. Defendant has completed its coverage investigation, but has unreasonably delayed its scope investigation, which has deprived Plaintiff of insurance benefits to which it is duly entitled under the Policy.

**A.    Defendant's Failure to Fully Cover The Dwelling Loss**

58.    In or about July 2023, Plaintiff noticed a claim for the water damage to Defendant and thereafter fully cooperated with Defendant, including by

communicating with and providing underlying damage documentation to Defendant's claims adjuster(s) consistently since the original notice.

59.    As the parties continued to discuss and negotiate a resolution to the 2023 loss claim, on or about June 6, 2025, Defendant confirmed it had denied a February 2025 tolling request from Plaintiff's predecessor public adjuster, and, on June 13, 2025, Defendant informed Plaintiff that the second tolling request was likewise denied.

60.    Without a tolling of the limitations period, Defendant has obstinately refused to cover the entirety of Plaintiff's claim while its saunters through its investigative process that has spanned nearly two years to date, and, despite Plaintiff frequently and timely providing Defendant what additional information it supposedly needs to finalize its review, no resolution of the claim has manifested, and Defendant has failed to fully cover Plaintiff's losses that unambiguously fall within the plain coverage provisions of the Policy.

61.    Moreover, Defendant's inexplicable investigative delays have deprived Plaintiff of insurance benefits and have increased Loss of Use damages suffered by Plaintiff.

62.    Delays in the Defendant's investigation (e.g., no vendor dispatched for cause-of-loss assessment, only an independent adjuster for damage review) and denials of tolling requests (February 2025 and June 13, 2025) have prevented repairs, increasing secondary damages such as mold proliferation and loss of use.

As of July 9, 2025, a flooring expert was assigned, but the withheld H2M flooring report (in possession for over two months) has hindered resolution.

## B. <u>Plaintiff's Damages</u>

63.    Through its slow-moving investigation, rejection of a tolling agreement and failure to cover the entirety of Plaintiff's property damage claim, Defendant has deprived Plaintiffs of roughly $75,000 in lost policy benefits, which reflects the amount of the necessary costs to repair the water damage that occurred at Plaintiff's insured Premises.

64.    Through its slow-moving investigation, rejection of a tolling agreement and failure to cover the entirety of Plaintiff's property damage claim, Defendant has deprived Plaintiff of additional lost policy benefits in the form of lost coverage for the necessary costs to repair the water damage

65.    Defendant's slow-moving investigation, rejection of a tolling agreement and failure to cover the entirety of Plaintiff's property damage claim has also forced Plaintiff to incur attorney's fees and costs in pursuit of the full coverage that it is entitled to receive under the Policy, and which it otherwise would not have incurred had Defendant honored its obligations and agreed to cover Plaintiff's claim.

66.    Plaintiff has made every effort to cooperate with Defendant in good faith, including consistent communication and sharing of pertinent claim information. But Defendant has refused to timely complete its investigation in

reciprocation of Plaintiff's good faith and ultimately left Plaintiff with no choice but to seek judicial intervention.

## COUNT 1: BREACH OF CONTRACT

67.    Plaintiff hereby incorporates the foregoing paragraphs as if fully set forth herein.

68.    As detailed above, Plaintiff's claims for property insurance coverage for the water damage that resulted from the second-floor bathroom overflow event in July 2023 is covered by the Policy and does not fall within any of the Policy's exclusions or coverage limitations.

69.    By failing to complete its investigation and fully compensate Plaintiff for its claim, Defendant has breached the Policy and has thereby caused Plaintiff to suffer substantial damages, which continue to amount.

70.    As a result of Defendant's breach or breaches of the Policy, Plaintiff is entitled to recover its actual damages, including but not limited to its out-of-pocket, reliance, and/or benefit-of-the-bargain damages.

## COUNT 2: BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

71.    Plaintiff hereby incorporates the foregoing paragraphs as if fully set forth herein.

72.    Under Connecticut law, Defendant's common law duties under the Policy include a duty of good faith and fair dealing.

73.    By failing to timely investigate, to agree to a tolling of limitation period and to fully compensate Plaintiff's claim for coverage under the Policy in the manner detailed above, Defendant has breached its duty of good faith and fair dealing, and thereby has caused Plaintiff to suffer and continue to suffer substantial damages (the exact amount of which will be shown at trial).

74.    As a result of Defendant's breach of its duty of good faith and fair dealing, Plaintiff is entitled to recover its actual damages, including but not limited to its out-of- pocket, reliance, and/or benefit-of-the-bargain damages.

75.    Defendant's breach of its duty of good faith and fair dealing also entitles Plaintiff to recover its reasonable attorney fees and expenses.

### COUNT 3: VIOLATIONS OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT AND THE CONNECTICUT UNFAIR INSURANCE PRACTICES ACT

76.    Plaintiff hereby incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

77.    Defendant is engaged in the business of providing insurance policies, including commercial and residential property insurance, to consumers and businesses in Connecticut.

78.    Defendant's business activities are consumer- and business-oriented and take place within the trade and commerce of the State of Connecticut.

79.    While Defendant has provided Plaintiff with limited insurance coverage under the Policy for sudden and accidental property damage—including

the water-related losses described above—its conduct in adjusting the claim has rendered that promised coverage illusory.

80.    Defendant engaged in unfair and deceptive acts and practices by purporting to provide coverage and then:

    i.    Conducting a dilatory, incomplete, and one-sided investigation of the claim;

    ii.    Refusing to toll the contractual limitations period despite active correspondence and unresolved investigative steps;

    iii.    Withholding critical inspection documents (e.g., the H2M flooring report); and

    iv.    Failing to fully indemnify Plaintiff for covered losses, in contravention of the Policy's terms.

81.    Defendant's actions have not only harmed Plaintiff but also violate public policy, are oppressive and unscrupulous, and have caused substantial injury to insureds and claimants in Connecticut. Defendant has systematically engaged in these practices to delay payment of valid claims and limit its own financial exposure—at the expense of policyholders.

82.    Defendant's conduct constitutes unfair claim settlement practices within the meaning of Connecticut General Statutes § 38a-816(6), and these practices are prohibited when committed with such frequency as to indicate a general business practice.

83.    Plaintiff alleges, upon information and belief, that Defendant has engaged in similar misconduct toward other insureds, both within Connecticut and in other jurisdictions, establishing a general business practice of:

    i.    Failing to timely investigate claims;

    ii.    Refusing to communicate clearly or respond in a reasonable timeframe;

    iii.    Withholding inspection reports or investigative findings from policyholders;

    iv.    Denying or underpaying claims based on flawed or incomplete adjustment processes; *and*

    v.    Refusing to extend tolling agreements even when their own delay has prejudiced policyholders' ability to act within the limitations period.

84.    On information and belief, Defendant has engaged in similar misconduct toward other insureds across Connecticut, demonstrating a broader and continuing pattern of wrongful conduct. Defendant's mishandling of the Plaintiff's claim is not an isolated occurrence, but part of a general business practice in violation of Connecticut General Statutes § 38a-816(6).

85.    Specifically, the Connecticut Insurance Department performed a Market Conduct Examination of AmGUARD for a sample period from January 1, 2022, through December 31, 2022. The resulting report, issued on July 12, 2024, found widespread violations of Connecticut insurance laws, including:

i.    The use of **eighteen (18)** entities acting as agents ***without*** the required license;

ii.    **Forty (40) entities** and **one hundred fourteen (114)** individuals acting as agents of AmGUARD ***without*** proper appointment;

iii.    **Eleven (11)** individuals acting as agents ***without*** any required license;

iv.    **One (1)** individual <u>adjusting claims</u> ***without*** the required casualty adjuster license;

v.    And AmGUARD's *failure to implement corrective actions* previously mandated by the Department in Consent Order MC 18-60 (April 18, 2019).

86.    These findings are formal determinations by the Connecticut Insurance Department, made pursuant to its authority under Connecticut General Statutes § 38a-15.

87.    The findings of the July 12, 2024 Market Conduct Report support the inference that AmGUARD has engaged in **a systemic pattern of inadequate claim oversight**, including the delegation of claim handling to unlicensed or improperly appointed agents and adjusters. This lack of regulatory compliance directly affects the quality and legality of claim investigations, as occurred here—where Plaintiff was subjected to delayed, deficient, and obstructive claim handling by a company that has demonstrated non-compliance across a significant number of claims and agents.

88.    As further evidence of this general business practice, Plaintiff will present at trial and/or through discovery: testimony, claims summaries, and documentation from other insureds who experienced similar handling by Defendant, including the following representative examples, among hundreds of others:

i.    **<u>Awilda Pimentel v. AmGuard Ins. Co.,</u>** No. CV 23-11005-FDS, 2024 WL 4557434 (D. Mass. Oct. 23, 2024)

In <u>Awilda Pimentel v. AmGUARD Insurance Company</u>, the United States District Court for the District of Massachusetts granted summary judgment in favor of the insured on all counts, including breach of contract and violation of Massachusetts General Laws Ch. 93A, based on AmGUARD's unreasonable and deceptive denial of a fire-loss claim. There, AmGUARD denied coverage under a homeowner's policy issued less than a month before the loss, contending that coverage "never attached" because the insured had not yet physically moved into her newly purchased residence. The court found that AmGUARD's interpretation ignored its own endorsement language, contradicted the statutory vacancy provisions governing standard fire policies, and would lead to absurd results—namely, that a homeowner could pay premiums for coverage that never existed. The court concluded that AmGUARD's position was "not grounded in the actual language of the policy," was "otherwise oppressive," and constituted an *unfair and deceptive trade practice* under Ch. 93A.

As in <u>Pimentel</u>, AmGUARD in the present matter relied on strained and self-serving policy constructions to deny legitimate coverage after collecting premiums and providing no clear notice of the limitations it later asserted. Both cases reflect AmGUARD's systematic practice of advancing unreasonable interpretations of its own policy language to avoid paying meritorious claims—conduct that demonstrates a general business practice of unfair claim settlement in violation of Connecticut General Statutes § 38a-816(6).

ii. **<u>O'Neal v. AmGUARD Insurance Co.</u>**, No. 4:22-cv-00181 (E.D. Tex. Apr. 13, 2023).

Likewise, in <u>O'Neal v. AmGUARD Insurance Co</u>., the United States District Court for the Eastern District of Texas denied AmGUARD's motion for summary judgment in a dispute over water damage resulting from Winter Storm Uri. The plaintiffs, homeowners insured under an "all-risk" policy, alleged that AmGUARD drastically undervalued their claim—initially tendering only $22,323.48 despite independent estimates placing the true cost of repairs at more than $55,000. AmGUARD refused to pay for substantial categories of damage, including flooring replacement and freeze-related deterioration throughout the home, prompting litigation for breach of contract, bad faith, and violations of the Texas Insurance Code and Deceptive Trade Practices Act. The federal court rejected AmGUARD's attempt to dispose of the claim on summary judgment, holding that genuine issues of material fact existed regarding the adequacy and

reasonableness of AmGUARD's claim-handling and coverage determinations.

The O'Neal decision reflects a familiar pattern observed in other jurisdictions: AmGUARD engages in a calculated practice of undervaluing and denying claims arising from widespread loss events, forcing insureds to resort to litigation to obtain full benefits. This consistent conduct—manifesting across property types, policy forms, and state lines—demonstrates that AmGUARD's unfair claim settlement practices are not isolated mistakes but deliberate operational policy.

**iii.** **Lee v. AmGUARD Insurance Co.**, No. 3:20-cv-1634-BJR (W.D. Wash. Nov. 22, 2021).

Further evidence of AmGUARD's pervasive pattern of bad faith claim practices appears in Lee v. AmGUARD Insurance Co., where the United States District Court for the Western District of Washington granted partial summary judgment against AmGUARD on claims for common-law bad faith and violations of the Washington Insurance Fair Claims Act ("IFCA"), RCW 48.30.015. The insured, Kit Lee, owned a small apartment building in Seattle that sustained severe fire damage. Despite repeated recommendations from its own adjuster (Engle Martin & Associates) to pay more than $130,000 in mitigation and reconstruction costs and $7,425 per month in lost rental income, AmGUARD ignored dozens of written communications from the insured, its adjusters, and even retained defense counsel. Over a sixteen-month period, AmGUARD failed to issue

undisputed payments, forcing its insured to defend a contractor's lien
action and live "on credit cards" while awaiting benefits. The court found
AmGUARD had violated multiple Washington Administrative Code
provisions governing fair claim practices, including WAC 284-30-330(2),
(4), and (7), each of which mirrors unfair settlement conduct prohibited
under Connecticut General Statutes § 38a-816(6). Judge Rothstein
characterized AmGUARD's conduct as "appalling" and "the definition of
hubris," concluding that "reasonable minds could not disagree" that
AmGUARD acted in bad faith and unreasonably denied payment of
benefits.

**iv.**    **Academy Bank, N.A. v. AmGUARD Insurance Co.**, F.4th 768 (8th
Cir. 2024)

Similarly, in <u>Academy Bank, N.A. v. AmGUARD Insurance</u>, the United
States Court of Appeals for the Eighth Circuit affirmed a jury verdict
finding AmGUARD liable for breach of contract and *vexatious refusal to
pay* under Missouri law. There, AmGUARD had insured a Days Inn hotel
owned by Shri Ganesai, LLC, with Academy Bank as mortgagee. After a
fire loss, AmGUARD suspected arson and denied coverage to the insured
owner, yet under the policy's terms it remained obligated to compensate
the mortgagee, Academy. Despite acknowledging liability and receiving
repeated demands for payment, AmGUARD delayed for over eighteen
months before tendering even the undisputed portion of the claim. The
Eighth Circuit upheld the jury's determination that AmGUARD's delay

constituted a vexatious refusal, emphasizing that "a claim of interest is
sufficient to support an award of damages or attorney's fees" and that
AmGUARD's conduct demonstrated a pattern of unreasonable and
recalcitrant delay.

v.   **Ash Meadows Townhome Association, Inc. v. AmGUARD
     Insurance Co.**, No. 21-cv-00029-RM-STV (D. Colo. Nov. 9, 2023)

The same pattern of deliberate delay and disregard for insureds' rights
was found in Ash Meadows Townhome Association, Inc. v. AmGUARD
Insurance Co., where a Colorado jury and the U.S. District Court jointly
determined that AmGUARD had acted in bad faith and unreasonably
delayed payment of covered hail-loss benefits owed to a condominium
association. Although AmGUARD's own independent adjuster had
identified extensive roof and exterior damage, the company ignored those
findings, withheld internal engineering reports, and insisted on partial
"spot repairs" using discontinued shingles that were demonstrably
unavailable.

The Court found that AmGUARD's concealment of evidence, reliance
on an inexperienced engineer, and refusal to meaningfully respond to the
insured's documentation compelled Ash Meadows to invoke appraisal—an
expense and delay caused entirely by AmGUARD's obstinacy. The
appraisal ultimately confirmed that the loss totaled nearly three times
AmGUARD's original estimate. The jury concluded that AmGUARD both
breached the insurance contract in bad faith and unreasonably delayed or

23

denied $669,939.10 in covered benefits. Applying Colo. Rev. Stat. § 10-3-1116, the Court entered judgment for double the delayed amount ($1,339,878.20) plus $348,717 in attorney fees and $71,778.75 in costs, and expressly denied AmGUARD's renewed Rule 50 motion, holding that "adequate evidence supports the jury's decision" and that AmGUARD's conduct showed reckless disregard for the unreasonableness of its claim handling.

Like Lee, O'Neal, and Academy Bank, the Ash Meadows case illustrates AmGUARD's recurrent use of appraisal and engineering pretexts to delay payment, disregard internal reports, and pressure insureds to accept reduced settlements.

**vi.    Zahid Hotel Group, LLC v. AmGUARD Insurance Co.**, No. 2:22-cv-02792-EEF-MBN (E.D. La. Dec. 1, 2023)

AmGUARD's repeated use of delay and underqualified personnel to frustrate legitimate claims is further illustrated by Zahid Hotel Group, LLC v. AmGUARD Insurance Co., arising from Hurricane Ida losses to a LaQuinta Inn in Kenner, Louisiana. The insured alleged that AmGUARD ignored its own adjuster's and engineer's findings—both of whom confirmed multi-million-dollar damage—yet delayed more than seven months before issuing a single payment of roughly $1 million, far short of the amount owed. AmGUARD then sought summary judgment on the insured's statutory bad-faith claims under La. R.S. §§ 22:1892 and 22:1973, arguing there was "no satisfactory proof of loss." Judge Fallon denied the

motion, emphasizing that AmGUARD's conduct raised genuine disputes of material fact as to whether its investigation was "careless," whether its employees were qualified, and whether the company made false assurances of an imminent $250,000 advance payment that never arrived. The court found that "bad faith necessarily implicates questions of fact," holding that AmGUARD's extensive delays and reliance on flawed internal procedures could support findings of arbitrary and capricious behavior under Louisiana law.

The Zahid Hotel Group decision, together with the aforementioned cases, demonstrates a consistent corporate pattern: AmGUARD repeatedly ignores its own adjusters' recommendations, withholds payments despite clear coverage, and deploys internal confusion as a justification for delay. Courts across multiple jurisdictions have now refused to grant summary judgment in AmGUARD's favor on bad-faith issues, underscoring that these are not isolated "adjustment errors" but manifestations of a company-wide strategy of obstruction. Such repetition satisfies the "general business practice" requirement of Connecticut General Statutes § 38a-816(6) as interpreted in Lees v. Middlesex Ins. Co., 229 Conn. 842, 849-50 (1994).

89.    AmGUARD has committed, and continues to commit the acts referred to in this Amended Complaint with such frequency as to constitute a general business practice of insurer misconduct in violation of CUPIA and CUIPA, as

evidenced by the aforementioned cases, as well as further allegations contained in various lawsuits filed against AmGUARD, including:

    **vii.**    <u>Ramos v. AmGuard Ins. Co</u>., 747 F. Supp. 3d 389 (D. Conn. 2024);

    **viii.**    <u>Angel Leston Corporation v. Berkshire Hathaway Guard Insurance Companies,</u> 2:20-cv-l2102 (D.N.J. 2020);

    **ix.**    <u>Lee et al v. AmGUARD Insurance Company et al</u>, 5:20-cv-210 (N.D. Cal 2020);

    **x.**    <u>Mexicali Border Cafe, Inc. v. AmGUARD Insurance Company</u>, 8:2l-cv-28 (M.D. Fla. 2021);

    **xi.**    <u>Benson v. AmGUARD Insurance Company</u>, l:16-cv-l96 (D. Del 2016);

    **xii.**    <u>Joy et al v. Berkshire Hathaway, Inc. et al</u>, l:20-cv-l131 (W.D. Tenn. 2020);

    **xiii.**    <u>Big Brothers/Big Sisters of Southwest Louisiana v. AmGUARD Insurance Company</u>, 2:21-cv-92 (W.D. La. 2021);

    **xiv.**    <u>Crazy Cuban LLC v. AmGUARD Insurance Company,</u> 1:18-cv-4614 (N.D. Ga. 2018); *and*

    **xv.**    <u>C.S.J. Limited Liability Co. v. AmGUARD Insurance Company</u>, 2:20-cv-8253 (D.N.J. 2020).

    90.    AmGUARD's general business practices of insurance misconduct are further evidenced by complaints filed with insurance departments of states in which AmGUARD does business. These complaints include allegations and claims of undue delay, failure to make timely payments, forcing insureds to institute litigation when unnecessary, and other unfair acts and practices all of which are similar to the unfair acts and practices committed against the Plaintiff in this action.

91.    This pattern of conduct, extending across multiple states and policy types, underscores that AmGUARD's actions here were not isolated or inadvertent, but rather emblematic of a consistent corporate approach to claims administration designed to limit coverage obligations through post-hoc interpretive maneuvers.

92.    These similar claim denials and adjustment tactics are not isolated incidents but part of an established and ongoing pattern of conduct by Defendant. The repetition of these practices with multiple insureds demonstrates that Defendant's violations of § 38a-816(6) are not inadvertent, but instead constitute an intentional or reckless business strategy.

93.    Defendant's business practices, as described herein, violate Chapters 704 and 735a of the Connecticut General Statutes—including §§ 38a-816(6) and 42-110b—and entitle Plaintiff to relief under Connecticut General Statutes § 42-110g.

94.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered substantial and ascertainable losses, including property damage, costs of litigation, attorneys' fees, and continued loss of use of the insured premises. These damages will be established in detail at trial.

95.    Plaintiff seeks all remedies available under CUTPA and CUIPA, including but not limited to actual damages, punitive damages, attorneys' fees, interest, and equitable relief.

## CONDITIONS PRECEDENT

96.    All conditions precedent to recovery of the damages sought herein have

been performed or have occurred.

## JURY DEMAND

97.    Plaintiff hereby demands a jury trial on all issues so triable under

applicable law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that, upon a final hearing of this

cause, the Court enter a judgment for Plaintiff and against Defendant that awards

to Plaintiff all compensatory damages sought herein; reasonable attorney's fees and

costs of suit; pre- and post- judgment interest as provided by law; and such other

and further relief to which Plaintiff may be justly entitled.


PLAINTIFF, 229 IRON ST LLC

BY/ss/ Dennis M. Durao
        Dennis M. Durao
        Federal Bar No.: ct29271
        Karsten & Tallberg, LLC
        500 Enterprise Drive, Ste. 4B
        Rocky Hill, CT 06067
        T: (860)233-5600
        F: (860)233-5800
        ddurao@kt-lawfirm.com